IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.  23-CR-30112-SMY |
| | ) | |
| BERNARD L. CHERRY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

The United States of America, by Rachelle Aud Crowe, United States Attorney for the Southern District of Illinois, and through Laura V. Reppert, Assistant United States Attorney, responds in opposition to the Defendant's Motion to Dismiss (Docs. 18 and 19). The United States asserts that various statutes criminalizing firearm possession such as Title 18, United States Code, Section 922(g)(1) remain constitutional following the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).  In support thereof, the United States offers the following memorandum.

Respectfully submitted,

RACHELLE AUD CROWE
United States Attorney

*s/Laura V. Reppert*
LAURA V. REPPERT
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
Tel: (618) 628-3700
E-mail: Laura.Reppert@usdoj.gov

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 1

II.    FACTUAL BACKGROUND ........................................................................... 1

III.   LEGAL BACKGROUND ............................................................................... 2

    A.  *Bruen's* "Text and History" Test. ....................................................... 2

    B.  Under *Bruen's* Framework, the Overwhelming Majority of Federal Courts Have Upheld § 922(g)(1) as Constitutional. .......................................................... 5

    C.  The Seventh Circuit's Decision in *Atkinson v. Garland.* ............................. 8

IV.   ARGUMENT ................................................................................................ 10

    A.  The Possession of Firearms by Felons Is Not Protected Under the Plain Text of the Second Amendment. ......................................................................... 10

    B.  Section 922(g)(1) Is Consistent With This Nation's Historical Traditions................. 16

        1.  Firearm Disqualification Laws ........................................................... 17

            a.  England .................................................................................... 17

            b.  Colonial America .................................................................... 20

            c.  Revolutionary War ................................................................. 21

            d.  Ratification Debates ............................................................... 23

        2.  Felony Punishment Laws ................................................................... 25

    C.  Summary ...................................................................................... 29

    D.  As an As-Applied Challenge, Defendant's Motion Fails. ................................ 33

V.    CONCLUSION .............................................................................................. 38

## I.  INTRODUCTION

Defendant Bernard L. Cherry is charged in an Indictment with two counts of being a prohibited person—in this case, a convicted felon—in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). R. 1. Defendant contends that under *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022), the federal statute prohibiting convicted felons from possessing a firearm is unconstitutional under the Second Amendment. R. 18, 19. Defendant's constitutional claim is without merit, whether construed as a facial challenge or an as-applied one. Since the Supreme Court decided *Bruen* in June 2022 (and continuing through January 2024), two federal appeals courts and over 450 federal district court opinions or orders, including a few in this district, have upheld the constitutionality of § 922(g)(1). Consistent with this substantial persuasive authority, this Court should deny defendant's motion and hold that (1) the plain text of the Second Amendment does not presumptively protect the right of felons to possess firearms, and (2) even if it did, § 922(g)(1) remains constitutional, as applied to all felons, because it "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

## II.  FACTUAL BACKGROUND

On June 10, 2023, two separate 911 callers reported a car accident near an off-ramp from Interstate 255 near Cahokia Heights, Illinois. When officers responded to the accident scene, they observed Defendant passed out behind the driver's seat of the car. No one else was in the car. Officers saw an empty pint of Hennessy brand liquor in his right hand. When one of the officers went to remove the bottle from Defendant's hand, he saw a "black object" under Defendant's arm, determined to be a Glock 22, .40 caliber firearm with an extended magazine loaded with 22 rounds of ammunition.

Less than two weeks later, the East St. Louis Police Department responded to a "shots fired" call where the victim stated the suspect was in a white SUV travelling toward State Street.

Officers locate a white SUV in the area and they activated their lights to attempt to stop the car. The white SUV accelerated and disregarded a stop sign before eventually stopping. Two people – one being Defendant – ran from the car after it stopped. An officer stated that he saw Defendant "[aim] an assault rifle in the direction of [his] location which was to the rear of him as he ran on foot to the east." Defendant fell and "surrendered himself." When officers retraced the path of the foot chase, they located a black Smith & Wesson M&P 15.

At the time Defendant possessed these firearms in June 2023, Defendant was prohibited from possessing a firearm under 18 U.S.C. § 922(g)(1).[1] More specifically, defendant's criminal record reflects felony convictions for Aggravated Robbery and Attempted Vehicular Hijacking[2] and multiple convictions for possessing a firearm as a convicted felon.[3]

The grand jury returned an indictment in this case on September 19, 2023. R. 1. Defendant is charged with Possession of a Firearm by a Felon on June 10, 2023, and June 21, 2023, in violation of 18 U.S.C. § 922(g)(1).

## III. LEGAL BACKGROUND

### A. Bruen's "Text and History" Test.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. 570, 635 (2008). The Court cautioned, however, that the right to keep and

---

[1] Section 922(g)(1) concerns any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." Here, the government refers to such individuals as felons.
[2] St. Clair County Case Number 05-CF-520.
[3] Southern District of Illinois Case Numbers 07-CR-30079-MJR, 17-CR-30040-DRH; Eastern District of Missouri Case Number 12-CR-00447-CEJ; St. Louis City Case Number 1222-CR03983.

bear arms "is not unlimited" and remains subject to "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons." *Id*. at 626, 627 n.26. Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *Heller*, 554 U.S. at 626-27).

In *Bruen*, the Supreme Court revisited the Second Amendment, explaining that it protects the right of "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." 142 S. Ct. at 2156. In so doing, *Bruen* struck down a New York law requiring residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home. *Id.* It also articulated a revised analytical framework for determining whether a modern firearm regulation is constitutional, directing courts to assess whether such regulations "are consistent with the Second Amendment's text and historical understanding." *Id.*

Under this two-step analysis, *Bruen* first directed that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, *Bruen* continued, where a regulation infringes on presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up).

*Bruen* set forth two avenues of historical inquiry. The first is what *Bruen* described as a "straightforward historical inquiry," which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." 142 S. Ct. at 2131. Under that

avenue of inquiry, to uphold a regulation as constitutional, courts should pinpoint evidence of "a distinctly similar historical regulation addressing that problem." *Id.* The second avenue of inquiry that *Bruen* directed is by "analogy." *Id.* at 2132. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Where there is no such straightforward correspondence—for example, where "unprecedented societal concerns or dramatic technological changes" are implicated—*Bruen* explained that "a more nuanced approach" is required. *Id.* In these scenarios, *Bruen* directed courts to consider "historical analogies" to the challenged law to determine whether it resembles historically acceptable restrictions. *Id.*

*Bruen* further explained: "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). And while *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it directed courts to treat as "*central* considerations," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33 (emphasis in original) (cleaned up); *see also id.* at 2133 ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). *Bruen* continued:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

4

*Id.* at 2133 (emphases in original) (cleaned up).

### B. Under Bruen's Framework, the Overwhelming Majority of Federal Courts Have Upheld § 922(g)(1) as Constitutional.

In *Bruen*, six Justices emphasized that certain firearms regulations—including prohibitions on felons' possession of firearms—remain constitutional. In his concurrence, Justice Alito explained that *Bruen* did not "disturb anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." 142 S. Ct. at 2157 (cleaned up). Justice Kavanaugh, writing separately and joined by Chief Justice Roberts, likewise reiterated that "longstanding prohibitions on the possession of firearms by felons" remain constitutional. *Id.* at 2162 (cleaned up). *See also id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (same).

Consistent with these assertions, post-*Bruen*, a significant majority of federal courts to have addressed the constitutionality of § 922(g)(1)—in over 450 separate rulings or orders—has concluded that the statute remains constitutional.[4] Two courts in the Southern District of Illinois is among that group. *See United States v. Ware*, 22-CR-30096 at R. 51 (S.D. Ill. May 19, 2023) (McGlynn, J.); *United States v. Christian Clubb*, 23-CR-30099-DWD at R. 34 (S.D. Ill. January 16, 2024) (Dugan, J.).

The first federal appeals court to weigh in on the matter—the Eighth Circuit—upheld the constitutionality of § 922(g)(1) under *Bruen*'s text and history test. *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). Addressing an as-applied challenge to § 922(g)(1)'s constitutionality brought by a defendant convicted of state-law felonies for selling controlled substances, *Jackson* explained that *Bruen* "did not disturb" the Supreme Court's prior "assurances" that *Heller* and

---

[4] Upon request, the government can provide this Court with a list of these 450+ opinions and orders.

*McDonald* did not cast doubt on felon-dispossession laws; that "there is considerable support in the historical record" for a legislature's authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society" as well as those who are "deemed more dangerous than a typical law-abiding citizen"; and that history "supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons, because the law is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 501–06. *See also United States v. Dunn*, No. 22-2539, 2023 WL 5065149, at *3 (8th Cir. Aug. 9, 2023) ("Following [*Bruen*], this court concluded that the felon-in-possession statute is constitutional, and there is 'no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)'") (citing *Jackson*, 69 F.4th at 502).

The Tenth Circuit has likewise upheld the constitutionality of § 922(g)(1). In *Vincent v. Garland*, the Tenth Circuit stated,

> Though *Bruen* created a new test for determining the scope of the Second Amendment, the Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons. If anything, *Bruen* contains two potential signs of support for these prohibitions. First, six of the nine Justices pointed out that *Bruen* was not casting any doubt on this language in *Heller*. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, —— U.S. ——, 142 S. Ct. 2111, 2157, 213 L.Ed.2d 387 (2022) (Alito, J., concurring); *id*. at 2162 (Kavanaugh, J, concurring, joined by Roberts, C.J.); *id*. at 2189 (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.).
>
> Second, *Bruen* apparently approved the constitutionality of regulations requiring criminal background checks before applicants could get gun permits. . . In preserving "shall-issue" regimes and related background checks, the Court arguably implied that it was constitutional to deny firearm licenses to individuals with felony convictions. *Bruen*'s language thus could support an inference that the Second Amendment doesn't entitle felons to possess firearms. *See Range v. Att'y Gen. United States*, 69 F.4th 96, 114 (3d Cir. 2023) (Shwartz, J., dissenting, joined by Restrepo, J.) (inferring from *Bruen*'s approval of criminal background checks "that felon bans" on guns "are presumptively lawful").

*Vincent v. Garland*, 80 F. 4th 1197, 1202 (10th Cir. 2023).

The Ninth Circuit also has recognized a "history and tradition of regulating the possession of firearms" in deciding a challenge to the constitutionality of Sentencing Guideline § 2D1.1(b)(1), which increases a defendant's base offense level by two levels "[i]f a dangerous weapon (including a firearm) was possessed" during a drug offense. *See United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023). After reviewing relevant historical analogues, *Alaniz* held that the Guideline was constitutional under the Second Amendment because there is "a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes" and that "drug trafficking fits squarely within that category of crimes." *Id.* at 1130. *See also United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, at *1 (5th Cir. Apr. 25, 2023) (on plain-error review, rejecting *Bruen*-based challenge to § 922(g)(1)'s constitutionality "because it is not clear that *Bruen* . . . dictates such a result"); *United States v. Garza*, No. 22-51021, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023) (same).[5]

Not all courts have held § 922(g)(1) constitutional post-*Bruen*, however. The government is aware of a few outliers. First, in *Range v. Garland*, the Third Circuit, sitting *en banc*, held the statute unconstitutional as applied to an individual with a disqualifying 1995 prior conviction. 69 F.4th 96 (3d Cir. 2023). *Range* "reject[ed] the Government's contention that only 'law-abiding,

---

[5] Post-*Bruen*, federal appeals courts also have upheld other firearms regulations. In *United States v. Sitladeen*, the Eighth Circuit upheld § 922(g)(5)(A) because "unlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend." 64 F.4th 978, 987 (8th Cir. 2023). In *National Rifle Ass'n v. Bondi*, the Eleventh Circuit upheld a Florida law requiring the purchaser of a gun to be 21 years old because the "law is consistent with our Nation's historical tradition of firearm regulation," *see* 61 F.4th 1317, 1320 (11th Cir. 2023), although that court later vacated the *Bondi* panel opinion after granting a petition for rehearing en banc, *see* 2023 WL 4542153 (11th Cir. July 14, 2023). The government recognizes that the Fifth Circuit has held unconstitutional, on an as-applied basis, § 922(g)(3), which criminalizes the possession of firearms by "unlawful users" of a controlled substance. *See United States v. Daniels*, 2023 WL 5091317 (5th Cir. Aug. 9, 2023). The government further recognizes that in *United States v. Rahimi*, the Fifth Circuit also held unconstitutional § 922(g)(8)—which makes it unlawful to possess a firearm if under a court order related to domestic violence. 61 F.4th 443, 461 (5th Cir. 2023) (describing such a ban as an "outlier[] that our ancestors would never have accepted"). On June 30, 2023, the Supreme Court granted certiorari in *Rahimi*. *See* 2023 WL 4278450. And on August 16, 2023, the Fifth Circuit explained that "in fact" *Rahimi* itself "suggests that *Bruen's* logic may not extend to [§ 922(g)(1)]." *See United States v. Washington*, No. 22-10574, 2023 WL 5275013, at *1 (5th Cir. Aug. 16, 2023).

7

responsible citizens' are counted among 'the people' protected by the Second Amendment." *Id.* at 103. It further held "the Government has not shown that our Republic has a longstanding history and tradition of depriving *people like Range* of their firearms." *Id.* at 106 (emphasis added). *Range* emphasized that its "decision today is a narrow one," applying "only" to plaintiff Range "given his violation of" a Pennsylvania misdemeanor statute criminalizing the making of a false statement to obtain food stamps. *Id.*

Additionally, a handful of different district court judges in different opinions have granted motions to dismiss charges brought under § 922(g)(1). Some of these opinions found § 922(g)(1) unconstitutional as applied to the particular defendant. Notably, a district court judge in the Northern District of Illinois found § 922(g)(1) as facially unconstitutional. *See United States v. Prince*, 22-CR-240 at R. 73 (N.D. Ill. November 2, 2023) (Gettleman, J.). Another district court judge in the Northern District of Illinois found § 922(g)(1) unconstitutional as applied to a particular defendant. *See United States v. Griffin*, 21-CR-693 (N.D. Ill. November 30, 2023) (Coleman, J.). Both of these cases are before the Seventh Circuit Court of Appeals.

### C.  The Seventh Circuit's Decision in *Atkinson v. Garland.*

On June 20, 2023, the Seventh Circuit issued a 2-1 opinion in *Atkinson v. Garland*, which involved an as-applied challenge to § 922(g)(1)'s constitutionality brought in a civil matter by a plaintiff with a felony mail-fraud conviction. 70 F.4th 1018 (7th Cir. 2023). *Atkinson* left entirely open the question of whether § 922(g)(1) remains constitutional after *Bruen*. Instead, because the district court in *Atkinson* had dismissed the complaint before *Bruen* was decided—and, as a result, without applying *Bruen's* "text and history" test—the panel majority in *Atkinson* remanded the matter "to allow the district court to undertake the *Bruen* analysis in the first instance." *Id.* at 1020. The panel majority further noted that the parties' appellate briefing also did "not grapple with

*Bruen*." *Id.* at 1022.[6] It remanded with instructions that the government further "develop its contention that the plain text of the Second Amendment does not protect felons and other offenders impacted by § 922(g)(1)" and "conduct a more substantial historical analysis." *Id.* at 1020–24. Even more specifically, the panel majority directed the parties to consider a series of "interrelated and non-exhaustive questions" on remand (*id.* at 1023–24)—which the government addresses in this memorandum (*see infra* at Section IV.C). At the same time, the panel majority recognized that "the historical analysis required by *Bruen* will be difficult and no doubt yield some measure of indeterminacy." *Id.* at 1024.

In dissent, Judge Wood explained that she would have upheld § 922(g)(1) as constitutional and without requiring a remand. *Id.* at 1018–38. Noting that "[g]un ownership and use in this country (both before and after the adoption of the 1787 Constitution) have always been subject to reasonable regulations," Judge Wood identified a "vast and diverse array of gun laws stretching from the colonial period, through the Founding Era, through Reconstruction (when the Fourteenth Amendment was added to the Constitution and ultimately made the Second Amendment applicable to state regulation), up to the present day." *Id.* at 1030, 1033. Judge Wood continued: "This is what makes up the text, history, and tradition to which *Bruen* directs us. And text, history, and tradition all point in the same direction: firearms have always been regulated in precisely the ways that concern us in the third decade of the 21st century." *Id.* at 1033. More specifically, Judge Wood explained that "the record behind the felon disentitlement statutes":

> reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed. That presumptive power is on display in the loyalty oath laws . . . and in the laws that disarmed persons found guilty of treason and members of native tribes. Though some of those laws would no longer pass muster under the Equal Protection Clause, they reveal

---

[6] The *Atkinson* plaintiff submitted his opening brief on appeal before *Bruen* was decided, and the government submitted its response brief only one month after the decision. Appeal No. 22-1557, R. 11, 21.

conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted. This power allowed the creation of categorical restrictions without any case-by-case escape hatch. *Section 922(g)(1) does precisely what statutes have been doing since the mid-18th century. It identifies the group of persons deemed dangerous to the political community—those convicted of the defined felonies—and it makes it unlawful for them to possess a firearm.*

*Id.* at 1035–36 (emphasis added).

## IV. ARGUMENT

Under *Bruen*'s "text and history" test, § 922(g)(1) remains a permissible restriction on firearms possession because felons do not fall within the textual purview of the Second Amendment. Even if they did, § 922(g)(1) remains constitutional because the statute is consistent with this nation's historical tradition of categorically prohibiting firearm possession by untrustworthy adherents to the law and of punishing felons through, among other things, capital punishment and estate forfeiture.

### A. The Possession of Firearms by Felons Is Not Protected Under the Plain Text of the Second Amendment.

As noted above, the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Felons do not fall within "the people" protected by the Second Amendment, and their "right . . . to keep and bear Arms" is thus not "infringed" by laws prohibiting their possession of firearms. Rather, the Second Amendment's protections extend only to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580. Section 922(g)(1)'s status-based restriction on who can possess firearms thus does not run contrary to the Second Amendment's plain text.

Legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their convictions. In his "massively popular 1868 Treatise on

Constitutional Limitations," Thomas Cooley recognized "an individual right" to keep and bear arms "unconnected with militia service." *Heller*, 554 U.S. at 616 (discussing Cooley's work at length). Yet even Cooley recognized that "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons therefore could historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights" belonging to "First-Class Citizens"—including the right to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48, 48 * (1998) (explaining these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked two hundred years ago and have remained so").

It remains the case that committing a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *See Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (citing 28 U.S.C. § 1865(b)(5), which bars convicted felons from serving on a federal jury; and *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), which upheld state felon disenfranchisement); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Section 922(g)(1) thus accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring

11

in part); *see also id.* (describing a lifetime gun-possession ban on felons as "historically grounded and sensible"). *See also*, *e.g.*, *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"); *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (observing that, historically, "felons were excluded from the right to arms because they were deemed unvirtuous") (cleaned up); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) ("In classical republican philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the virtuous citizen, such that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals).")); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (same).

The Supreme Court's interpretation of the Second Amendment's text confirms the view that legislatures are permitted to disarm convicted felons. In *Heller,* the Supreme Court struck down the District of Columbia's ban on handgun possession in the home, explaining that the Second Amendment confers an individual "right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. The Court parsed the Second Amendment's text and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights." *Id.* at 635. *See also id.* at 631 (explaining that the District had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane").

*Bruen* did not deviate from *Heller's* principle that the right to bear arms belongs only to "law-abiding, responsible citizens." 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Certainly, in his concurrence, Justice Alito stressed that *Bruen* "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.* at 2157. Still, *Bruen*

characterized the holders of Second Amendment rights as "law-abiding" citizens no less than 14 times. For example, *Bruen* concluded that the New York statute "violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," *id*. at 2156; explained that the Second Amendment "'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense," *id.* at 2131 (quoting *Heller*, 554 U.S. at 635); and instructed courts to identify historical analogues to modern firearm regulations by assessing "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 2133.[7]

And while *Bruen* invalidated New York's "may-issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id.* at 2138 n.9. The Court explained that shall-issue regimes—many of which prohibit the issuance of licenses to felons—generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Justice Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing regimes are constitutionally permissible." *Id.* at 2162

---

[7] *See also Bruen* 142 S. Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id*. ("[O]rdinary, lawabiding citizens have a similar right to carry handguns publicly for their self-defense."); *id*. at 2125 (describing petitioners as "law-abiding, adult citizens"); *id*. at 2133 (referencing New York's argument that "sensitive places where the government may lawfully disarm law-abiding citizens include all places where people typically congregate" (quotations omitted)); *id*. at 2134 (reiterating that petitioners are "two ordinary, law-abiding, adult citizens"); *id*. at 2135 n.8 ("[I]n light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law abiding citizens from publicly carrying handguns . . . ."); *id*. at 2138 ("Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."); *id*. at 2138 n.9 (noting shall-issue public carry licensing laws "do not necessarily prevent 'law abiding, responsible citizens' from exercising their Second Amendment right to public carry" but rather "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotation omitted)); *id*. at 2150 ("none [of the historical regulations surveyed] operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"); *id*. at 2156 ("Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to demonstrate a special need for self-protection . . . ." (quotations omitted)).

(Kavanaugh, J., concurring). *Bruen*'s endorsement of those licensing schemes would make little

sense if the Second Amendment presumptively protected felons from disarmament.[8]

The frequency with which *Bruen* employed the phrase "law abiding, responsible

citizens"—rather than a broader reference to "the people" or "all Americans"—strongly indicates

that this was a deliberate choice of language that should be afforded due weight. *See Jackson*, 69

F.4th at 503 (in upholding the constitutionality of § 922(g)(1), emphasizing "the Supreme Court's

repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding

citizen' to keep and bear arms). As one court in the Northern District of Illinois explained in

rejecting a *Bruen*-based challenge to § 922(g)(1):

> Indeed, the [*Bruen*] majority used the phrase "law-abiding" to describe "the
> people" whose rights the Second Amendment guarantees no fewer than fourteen
> times, including in its concluding paragraph. . . .
>
> * * *
>
> The government argues that those charged under section 922(g)(1), by definition,
> are not law-abiding citizens but rather are among the classes of individuals whose
> rights to bear arms historically have been restricted for public safety. The Court
> agrees with the government. Section 922(g)(1) is a constitutional restriction on
> firearms possession because convicted felons—whether their underlying felony
> was violent or not—are, by definition, not law-abiding and therefore do not fall
> within the textual purview of the Second Amendment.

*United States v. Edward Price*, 21 CR 164 at R. 122 at 4–5 (emphasis added) (N.D. Ill. Feb. 13,

2023) (Kennelly, J.). *Accord United States v. Ricky Price*, 19-CR-824 at R. 105 at 1 (N.D. Ill. Mar.

3, 2023) (Guzman, J.); *United States v. Garrett*, 18-CR-880 at R. 144 at 4 (N.D. Ill. Jan. 11, 2023)

(Bucklo, J.) ("[T]he *[Bruen]* majority uses the phrase 'law-abiding' to describe 'the people' whose

rights the Second Amendment guarantees no fewer than fourteen times."); *United States v. Tavon*

*Williams*, 22 CR 121 at R. 42 (N.D. Ill. May 3, 2023) (Shah, J.) ("There is room to argue that

---

[8] A "shall-issue" regime is one in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements." *Bruen*, 142 S. Ct. at 2123. By contrast, a "may-issue" regime vests "authorities [with] discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria." *Id.* at 2124.

felons fall within 'the people,' but without binding precedent on that front, I accept the Supreme Court's statement that felon disarmament is presumptively lawful, and therefore outside the right protected by the Second Amendment.").[9]

United States v. Meza-Rodriguez, 798 F.3d 664 (7th Cir. 2015), does not alter this analysis. In *Meza-Rodriguez*, the Seventh Circuit stated that although some of the language used in *Heller* linked Second Amendment rights with notions of "law-abiding citizens," those passages did not, themselves, define the term "people." *Id.* at 669. But as *Atkinson* itself acknowledged, *Meza-Rodriguez* was written before *Bruen* and therefore did not have the benefit of *Bruen's* repeated use of the phrase "law-abiding citizens" to describe the scope of the Second Amendment. *See Atkinson*, 70 F.4th at 1023 (recognizing that although the Seventh Circuit "analyzed the scope of the Second Amendment right before *Bruen*" it has "not returned to the issue since then").

Further, an argument that the phrase "the people" must be used consistently throughout the Founding Era constitutional text proves too much and attempts to paper over fundamentally different aspects of fundamentally different rights. For instance, noncitizens are not among "the people" who may vote in congressional elections. *See* U.S. CONST. Art. I § 2 cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by *the People* of the several States") (emphasis added)); 18 U.S.C. § 611 (excluding illegal immigrants from voting in

---

[9] In the Third Circuit's en banc decision in *Range*, the majority dismissed repeated references in *Heller, McDonald*, and *Bruen* to "law-abiding, responsible citizens" as "dicta" because those cases did not involve "the criminal histories of the plaintiffs" and the term is "as expansive as it is vague." 69 F.4th at 101–02. *See also Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *21 (expressing same concern). But as two of the dissenting judges in *Range* noted, the *Range* majority ignored critical context from *Heller* in coming to that conclusion:

> In holding "the right of the people" protected by the Second Amendment was an "individual right," Justice Scalia's seminal opinion in *Heller* specified this meant "the right of law-abiding, responsible citizens" to keep and bear arms, and therefore characterized "prohibitions on the possession of firearms by felons" as both "longstanding" and "presumptively lawful."

*Range*, 69 F.4th at 119 (citing *Heller*, 554 U.S. at 626–27, 635 & n.26) (Krause, J., dissenting); *see also id.* at 114 ("[T]he Supreme Court's jurisprudence tells us that the right to bear arms is limited to law abiders, and that felon bans are presumptively lawful.") (Shwartz, J., dissenting; joined by Restrepo, J.).

elections for federal offices). Or as the district court noted in *Edward Price*, an argument that "the people" should be defined consistently for purposes of various amendments "ignores differences between the rights protected by the First and Second Amendments, as the exercise of rights under the First Amendment do not put at risk the physical safety of others." No. 21 CR 164, Dkt. 122 at 8-9.

In short, the Second Amendment's text—and Supreme Court cases interpreting this text consistent with history—demonstrates that it does not encompass felon possession of firearms.

**B.  Section 922(g)(1) Is Consistent With This Nation's Historical Traditions.**

Even if this Court were to conclude as a textual matter that a felon in possession of a firearm is part of "the People" protected under the Second Amendment, Defendant still cannot prevail under *Bruen* because § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Beginning in England and lasting at least through the founding era, history is replete with regulations reflecting the power of legislatures to disarm categories of individuals. Two types of historical laws are particularly pertinent to modern-day felon-dispossession laws: 1) laws categorically disqualifying groups who were untrustworthy adherents to the law from possessing firearms; and 2) laws authorizing capital punishment and estate forfeiture for felonies.[10]

---

[10] The section that follows references historical regulations upon which this Court may rely in applying *Bruen*'s "text and history test." Exhibit A includes a list of those laws, along with a link to online databases where they may be accessed. The government has worked to confirm that the links in Exhibit A are operable. (The government can also provide copies of those laws upon request.) The government stresses that because *Bruen* asked courts to answer a question of law—not a question of fact, or a mixed question of law and fact—this Court can analyze these sources without the assistance of an expert. *Bruen*, 142 S. Ct. at 2130 n.6 (describing its methodological approach as a "legal inquiry" and rejecting argument that "judges are relatively ill equipped to resolve difficult historical questions or engage in searching historical surveys") (cleaned up). It is well established that the "interpretation" of a constitutional or statutory provision "is a question of law." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995). That is so even when interpretation involves historical work or otherwise depends in part on "legislative facts"—that is, facts that bear on "the formulation of a legal principle or ruling by a judge or a court" as distinct from "the facts of the particular case." Fed. R. Evid. 201 advisory committee's note. The Supreme Court, for example, has relied on history and tradition in interpreting a range of constitutional provisions, including Article II, *see Zivotofsky v. Kerry*, 576 U.S. 1, 23-28 (2015); Article III, *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021); the Establishment Clause, *see Marsh v.*

1. **Firearm Disqualification Laws**

By the time the Second Amendment was ratified in 1791, there was an established tradition of legislatures exercising broad authority to disqualify people categorically from possessing firearms based on a judgment that certain groups simply could not be trusted to adhere to the rule of law. That history is set forth next. *See Bruen*, 142 S. Ct. at 2127 (because the right to keep and bear arms was a "pre-existing right," directing courts to consider "English history dating from the late 1600s, along with American colonial views leading up to the founding").

a. **England**

Because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds important light on the limits to the "'right secured by the Second Amendment.'" *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be relied upon to obey the rule of law.

In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688).[11] This "Act for the better secureing the Government by disarming Papists

---

*Chambers*, 463 U.S. 783, 786-792 (1983); the Free Speech Clause, *see Houston Community College System v. Wilson*, 142 S. Ct. 1253, 1259-1260 (2022); the Due Process Clause, *see Burnham v. Superior Court*, 495 U.S. 604, 610-616 (1990) (plurality opinion); and the Confrontation Clause, *see Crawford v. Washington*, 541 U.S. 36, 42-50 (2004). In addition, as the Supreme Court explained in discussing the common-law rule that treated questions of foreign law as questions of fact, treating *Bruen*'s historical inquiry as a question of fact would produce "a number of undesirable practical consequences." *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) (citation omitted). The relevant historical material would have to be established in each case "in accordance with the rules of evidence," and appellate review would be "deferential and limited to the record made in the trial court." *Id.* (citation omitted). As a result, the meaning of the Second Amendment could vary from case to case depending on the particular record the parties compiled in the district court.
[11] Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords* 1685-1691, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689; *Bill of Rights* [1688], https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that "[i]t appears that all the Acts of" the first Parliament of William and Mary "were treated as being Acts of 1688" in official sources under an "old method of reckoning"—including the English Bill of Rights, discussed shortly,  which was similarly enacted in 1689).

and reputed Papists" provided that a Catholic could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.*; *see also Jackson*, 69 F.4th at 502. Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith (and thus their allegiance to the Pope) could not be trusted to obey English law. *Range*, 69 F.4th at 121–22 (Krause, J., dissenting); *see also Jackson*, 69 F.4th at 502. This prohibition was not based on a theory that all Catholics were dangerous; rather, the categorical disarmament was based on a concern with a group's propensity to disobey the sovereign. *Range*, 69 F.4th at 121–22 (Krause, J., dissenting). *See also Heller*, 554 U.S. at 592-93 ("Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using select militias loyal to them to suppress political dissidents, in part by disarming their opponents.") (Scalia, J.).[12]

In her oft-cited dissent in *Kanter v. Barr*, then-Judge Barrett also observed that the English Parliament disarmed Catholics, although her analysis focused on the "threatened violence and the risk of public injury" that Catholics (and later on, slaves and Native Americans) were presumed to present as the primary reason for disarmament. 919 F.3d 437, 456–58 (7th Cir. 2019). But even then-Judge Barrett's dissent recognized "that [the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy.'" *Id.* at 457 (citing Adam Winkler, *Gunfight*

---

[12] The statute further made clear that its concern was with propensity to disobey the sovereign by providing that anyone who decided to make the declaration after having previously refused would regain the ability to keep and bear arms. 1 W. & M., Sess. 1, c. 15, *in 6 The Statutes of the Realm*, *supra*, at 72. Other colonialand founding-era laws discussed later in this response had similar "restoration" provisions. *See also, e.g.*, *Range*, 69 F.4th at 123, 125–26 (Krause, J., dissenting); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). Section 922(g)(1) has similar provisions, allowing for the restoration of the right to keep arms upon the requisite showing. 18 U.S.C. §§ 921(a)(20) and 925(c); *see also Atkinson*, 70 F.4th at 1036 (Wood, J., dissenting) (noting that "Congress has never chosen to activate" the § 925(c) mechanism, but that her analysis of § 922(g)(1)'s constitutionality "does not depend on its existence").

115 (2011)). Moreover, a focus on untrustworthiness—rather than, more explicitly, danger—has
other historical roots. For instance, "[f]ollowing the tumult of the English Civil War, the restored
Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants," even though such
nonconformists included pacifist denominations like the Quakers. *Range*, 69 F.4th at 120-21
(Krause, J., dissenting) (collecting sources). Such groups "often refused to take mandatory oaths
acknowledging the King's sovereign authority over matters of religion" and, as a result,
"Anglicans accused nonconformists of believing their faith exempted them from obedience to the
law." *Id.* Their commitment to non-violence did not spare their firearms. *See also Jackson*, 69
F.4th at 504 ("Not all persons disarmed under historical precedents—not all Protestants or
Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early
Americans who declined to swear an oath of loyalty—were violent or dangerous persons" and yet
they were disarmed nonetheless); *Range*, 69 F.4th at 124-26 (Krause, J., dissenting) (noting that
colonial- and Revolutionary-war-era laws disarmed "sizable numbers of pacifists" such as the
Quakers, Moravians, and Mennonites, "not . . . because they were dangerous, but rather because
their refusal to swear allegiance demonstrated that they would not submit to communal judgments
in law when it conflicted with personal conviction").

The aforementioned examples from England are particularly relevant because the same
Parliament wrote the 1689 English Bill of Rights, which "enshrined basic civil liberties" and
became the predecessor to our Second Amendment. *Bruen*, 142 S. Ct. at 2141; *Heller*, 554 U.S. at
593; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). That predecessor specified that "*Protestants*
may have Arms for their Defence suitable to their Conditions *and as allowed by Law*." 1 W. & M.,
Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69
F.4th at 502; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). "Englishmen had never before

claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142 (quotation marks and citation omitted). And yet when they first formally claimed that right, the English ensured that the Parliament retained the power—which it in fact exercised—to arm one class of the population and to disarm another based on concerns that the members of that latter class would not abide by the law. *See Atkinson*, 70 F.4th at 1031 ("Not quite a ringing endorsement of an untrammeled right to keep and bear arms, it instead builds in the idea that this right exists 'as allowed by law.'") (Wood, J., dissenting).

### b. Colonial America

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were not dependable adherents to the rule of law. For example, firearm regulations directed toward disarming Native Americans and Black people were pervasive.[13] "While some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th 503; *see also Range*, 69 F.4th

---

[13] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g.*, *Laws and Ordinances of New Netherland, 1638-1674*, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of the State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law); *see also Atkinson*, 70 F.4th at 1035 n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes").

at 122 n.50 (Krause, J., dissenting) (rejecting these "bigoted and unconstitutional laws" but citing them to demonstrate the "tradition of categorical, status-based disarmaments"). The colonies also disarmed full-fledged members of the political community—i.e., free, Christian, white men— "whom the authorities believed could not be trusted to obey the law." *Range*, 69 F.4th at 122 (Krause, J., dissenting). "Those restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights." *Id.* (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)).

Massachusetts, for example, disarmed the supporters of an outspoken preacher in the 1630s "not because those supporters had demonstrated a propensity for violence," but because "the authorities concluded their conduct evinced a willingness to disobey the law." *Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937)); Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988); John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017)).

### c. Revolutionary War

Throughout the Revolutionary War, American legislatures passed numerous disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government.

An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony*

*of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the colonies enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law); *see also Jackson*, 69 F.4th at 503 ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty."); *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").

A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries,

and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights, *see supra* at Section IV.A. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.

As noted earlier, the Pennsylvania law had the effect of depriving "sizable numbers of pacifists" of the right to bear arms "because oath-taking violated the religious convictions of Quakers, Mennonites, Moravians, and other groups." *Range*, 69 F.4th at 125 (Krause, J., dissenting). That law is also particularly informative because the year before enacting it, Pennsylvania became one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, *in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 278 (Neil Cogan ed., Oxford University Press 2d ed., 2014); *see also* N.C. Declaration of Rights of 1776 § XVII, *in The Complete Bill of Rights, supra*, at 277-78 (individual rights-based constitutional provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII, *in The Complete Bill of Rights*, *supra*, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above).

### d.  Ratification Debates

The history behind the Second Amendment's adoption provides additional persuasive evidence that the founders understood the individual right to bear arms to be compatible with broad legislative authority to disarm groups who could not be trusted to follow the law.

One "Second Amendment precursor" that *Heller* described as "highly influential" is particularly instructive. 554 U.S. at 604. When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to

23

reject ratification on this basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great importance in the history of the federal Bill of Rights"). The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated: "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). In other words, the founders recognized that "crimes committed"—violent or not—can supply an independent ground for a legislature to prohibit firearm possession. As the D.C. Circuit has explained, "[t]he use of the word 'or'" in this proposal reflects that "criminals, in addition to those who posed a 'real danger,'" have historically been "proper subjects of disarmament." *Medina*, 913 F.3d at 158–59.

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, founding father Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added) (quotation marks omitted). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added). These proposals, like the Pennsylvania one, recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry.

24

To be sure, the Second Amendment, as adopted, does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including "the felon," Cooley, *supra*, at Section IV.A, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood").

Under *Bruen*, the absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals permits courts to "assume it settled" that such regulations are "consistent with the Second Amendment." 142 S. Ct. at 2133. *Bruen* itself illustrated that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses"—where the Court was "also aware of no disputes regarding the lawfulness of such prohibitions," it could "assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* The same conclusion can be drawn with respect to felon disarmament.

## 2.  Felony Punishment Laws

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, English jurist Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he idea of felony

25

is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *See Medina*, 913 F.3d at 158. Capital punishment for felonies was "ubiquit[ous]" in the late 18th century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas, but also nonviolent conduct relating to forging or counterfeiting a public security. *See An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who "escaped from jail after being condemned to death" for "forgery" or "horse-stealing"). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

Throughout the 1700s, American colonies punished a variety of crimes with death, estate forfeiture, or both. A 1700 Pennsylvania law provided that any person convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor." 2 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 12 (1896). A 1705 Pennsylvania law

provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id.* at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 *The Laws of Maryland, With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811). A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33-34 (1767). And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes and one year's imprisonment. 3 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 545 (1878).

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302 (1821) (1777 Va. forgery law). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes." *Id.* at 302-03. *See also, e.g.*, *A Digest of the*

27

*Laws of Maryland* 255-56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy").

In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes including counterfeiting (as well as burglary, robbery, arson, and malicious maiming and wounding). 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law). The act also established that every person convicted of such an offense "shall forfeit to the people of this State, all his[] or her goods and chattels, and also all such lands, tenements, and hereditaments[] . . . at the time of any such offence committed, or at any time after." *Id*. at 666. For other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense . . . committed after such first conviction" was "death." *Id.* at 665.[14]

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *see also Jackson*, 69 F.4th at 503 (noting that early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property"); *Range*, 69 F.4th at 126-27 (Krause, J., dissenting) ("[T]he ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament."). Thus, "tradition and history" show that "those

---

[14] Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 260-61 (1886) (1786 N.Y. law). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State . . . ." *Id.* at 261.

convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160.

In her dissent in *Kanter*, then-Judge Barrett resisted this analysis, concluding that "[t]he upshot of this history for present purposes is that the consequences of a felony conviction were not as categorically severe as the government suggests." 919 F.3d at 461 (Barrett, J., dissenting). At the same time, the *Kanter* dissent recognized, "history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens." *Id.* at 462 (citing Cooley, *supra*). In other words, even a contrary point of view recognizes a form of "civil death" that resulted from the commission of a felony. *Id.* at 458. Although the *Kanter* dissent tries to divorce this "civil death" from disarmament—arguing that the former implicates rights exercised "as part of the collective enterprise of self-governance," while the right to bear arms is a purely individual one—the majority in *Kanter* did not agree with that view of history. *Id.* at 462 (acknowledging that "the majority is sympathetic to [the] view" that the same lack of virtuosity or "poor character" that cost felons their civic rights also permitted legislatures to disarm them).

Moreover, the *Kanter* dissent does not reckon with language in Supreme Court decisions linking the Second Amendment's protections to the ability to exercise civic rights. As noted earlier, Supreme Court jurisprudence ties the Second Amendment's protections to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580. Even the consequence of mere "civil death," in other words, is enough to demonstrate that the Second Amendment does not protect felons' possession of firearms.

### C.  Summary

To help summarize the analysis set forth in Section IV.B above, the government relies on the questions expressly posed by the *Atkinson* panel majority. 70 F.4th at 1023-24. In response to those questions, the government states:

*First*, § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" in that the statute relates to the disarmament of individuals who, like felons, are untrustworthy adherents to the rule of law. The historical record discussed above demonstrates that the founders inherited a tradition under which legislatures had broad discretion to disarm classes of people that could not be counted upon to be responsible, law-abiding members of the polity. Like the laws enacted by earlier generations, § 922(g)(1) permits legislatures to categorically disarm groups of people who present that concern.

*Second*, history tells us that 1) across relevant eras, legislatures categorically disarmed groups who they feared would disregard the law and disturb the social order and that such a categorical prohibition specifically appeared in the English precursor to the Second Amendment; 2) the Ratification Debates reflect no meaningful founding-era disputes regarding the lawfulness of disarming criminals, despite the use of express language to that effect in influential American precursors to the Second Amendment, thus demonstrating that the founders understood the right to bear arms to be compatible with the broad legislative authority to disarm felons; and 3) under English common law and throughout early American history, convicted felons were subject to capital punishment, estate forfeiture, and so-called "civil death," thus demonstrating that firearms dispossession was subsumed within those greater punishments and the expulsion of felons from the political community.

From these lessons, this Court can conclude that § 922(g)(1) does not violate the Second Amendment. The aforementioned regulations were pervasive, and their underlying rationales—

like the impetus behind § 922(g)(1)—prioritized social order and respect for the law over a pre-existing right to self-defense. *See Bruen*, 142 S. Ct. at 2132–33 (directing courts to consider as "*central* considerations when engaging in an analogical inquiry," "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"); *Jackson*, 69 F.4th at 504–05 (explaining that § 922(g)(1) aims to disarm individuals viewed as "potentially irresponsible" and to prevent not just violence, but also "lawlessness"). Although some of these predecessors do not apply specifically to felons, this Court should remain mindful of *Bruen*'s admonition that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*" and "[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133. Moreover, the lack of an identical historical statute does not suggest that the founding generation would have viewed § 922(g)(1) as violating the Second Amendment. As one district court has observed, a "list of the laws that *happened to exist* in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority.

*Third*, although the government has emphasized the historical rationale for disarming groups perceived as an overall threat to the social order, a historical rationale for disarmament based on perceived danger supplies another helpful analogue. In *Jackson*, the Eighth Circuit reviewed a substantially similar set of historical materials as the materials summarized above and concluded that they could be read as supporting either rationale. 69 F.4th at 502 ("While the better

interpretation of the history may be debatable, we conclude that either reading supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons."). *See also id.* at 502–05 (evaluating historical materials through a dangerousness lens).

A dangerousness-rooted historical rationale for disarmament supports the validity of § 922(g)(1), as applied to all felons. As *Jackson* explained, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable *risk of danger* if armed," not based on "an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* at 504 (emphasis added). *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (historical evidence supports the proposition "that the legislature may disarm those who have demonstrated *a proclivity for violence or whose possession of guns would otherwise threaten the public safety"*) (emphasis added). And as the Seventh Circuit's *Kanter* majority has explained, "prohibiting even nonviolent felons . . . from possessing firearms is substantially related to [the government's] interest in preventing gun violence" where an empirical connection exists "between nonviolent offenders . . . and a risk of future violent crime." 919 F.3d at 448–49. The Seventh Circuit said the same in *Yancey*, explaining that "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." 621 F.3d at 685. *See also Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008) ("[N]onviolent offenders not only have a higher recidivism rate than the general population, but certain groups—such as property offenders—have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent.").

*Fourth*, the aforementioned analogous laws supply enough of a historical tradition to support the constitutionality of § 922(g)(1). These are not "isolated instances of regulation,"

*Atkinson*, 70 F.4th at 1024, but are rather rooted in English common law and were adopted across the colonies before their understanding and the practice they represented was incorporated into the Second Amendment.

The government addresses the fifth and final question posed by *Atkinson* in the section that follows regarding the as-applied nature of defendant's challenge.

### D. Defendant's As-Applied Challenge Fails.

Defendant's motion before this Court specifically raises an "as applied" challenge to the constitutionality of § 922(g). R. 24 at 4. This Court should reject that that challenge.

The Seventh Circuit has never actually upheld an "as applied" Second Amendment challenge to § 922(g) and has, in fact, "repeatedly rejected as-applied Second Amendment challenges" to that statute. *See Kanter,* 919 F.3d at 443. Certainly, the Seventh Circuit in *Kanter* noted that it "left room for as-applied challenges" to § 922(g). 919 F.3d at 443. But, to date, the Seventh Circuit has not done so. Regardless, there is no question here that defendant is a convicted felon—that is, a non-law abiding citizen not covered by the Second Amendment and subject to firearms regulations consistent with this nation's historical tradition.

The boundaries of the Second Amendment do not rest on an individual, case-by-case determination of the danger each felon poses to public safety. There is no historical evidence to support a position that the constitutionality of § 922(g)(1) turns on individualized assessments. The *Atkinson* panel majority noted:

> [A]lthough Atkinson has shown some support for the idea that a group's "dangerousness" is what mattered to the Founders, he does not provide much historical basis for individualized assessments or for delineating between individuals who committed violent versus non-violent crimes. The distinction is not an obvious consequence of many of the laws that Atkinson, and his amicus especially, discuss.

70 F.4th at 1023; *see also id.* ("Atkinson's historical analysis falls short.").

33

Instead, as detailed above, the historical tradition supports the legislature's ability to disarm whole *categories* of individuals. *See Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament"); *Jackson*, 69 F.4th at 504 ("Legislatures historically prohibited possession by categories of persons . . . ."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (disarmament "is not limited to case-by-case  exclusions of persons who have been shown to be untrustworthy with weapons"); *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (pre-*Bruen*, explaining that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis"). The relevant question, in other words, is whether the status at issue indicates that the person cannot be trusted to use a gun responsibly, not whether each individual can be trusted to do so.[15]

Additionally, even assuming the historical tradition supports disarming only "dangerous" individuals, Defendant's prior felony convictions demonstrate a level of dangerousness worthy of permanent deprivation of firearms. *See Atkinson*, 70 F.4th at 1024 ("Nor does Atkinson tell us what the Founders would have viewed as a 'violent' crime and what evidence they would consider in making that determination."). As set forth above, the historical tradition reflects a broad

---

[15] Individualized assessments could also yield wildly disparate results. *See, e.g.*, *Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (suggesting that enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image"); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (individualized exemptions would "obviously present serious problems of administration, consistency and fair warning"). And in the criminal context, in particular, the opportunity for pre-trial fact-finding is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial if individualized facts, at least those relevant to the crime itself (like a § 922(g)(3) offense), are relevant. *See, e.g.*, *United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to § 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)); Fed. R. Crim. P. 12(b)(3) (limiting pretrial motions to motions that "can be determined without a trial on the merits").

conception of "dangerous," one that includes even the risk of violence. *See, e.g.*, *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) (disarmament was "based on the danger [categories of persons] pose[d] to the political community if armed"); *Jackson*, 69 F.4th at 504 (disarmament "based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed"); *Alaniz*, 69 F.4th at 1129-30 (there is "a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes"); *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) ("Breaches of the peace comprise not only cases of actual violence to the person of another, but any unlawful acts, tending to produce an actual breach of the peace; whether the peace of the public, or an individual, be in fact disturbed or not.") (citing *Pearce v. Atwood*, 13 Mass. 324, 332 (1816)).

As detailed at the outset of this response, Defendant has a criminal history that includes convictions for Aggravated Robbery, Attempted Vehicular Hijacking, and numerous convictions for possessing firearms following those convictions for violent offenses. This criminal record more than supports a finding of dangerousness (assuming *arguendo* that label is relevant to the § 922(g)(1) constitutionality analysis) as it does reflect the risk defendant poses to public safety, his disregard for the law, and society's inability to trust that he will use a weapon responsibly. There is no question therefore that Defendant is among the class of individuals constitutionally prohibited from possessing firearms under § 922(g)(1) and, therefore, any as applied challenge fails.

## V. CONCLUSION

For the reasons stated above, the Court should deny Defendant's Motion to Dismiss the Indictment.

Respectfully submitted,


RACHELLE AUD CROWE
United States Attorney

*s/ Laura V. Reppert*
LAURA V. REPPERT
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
Tel: (618) 628-3700
E-mail: Laura.Reppert@usdoj.gov